# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )          Case No. 24 - m - 648
Information associated with the Google accounts located within the )
geographical region near the intersection of County Highway M and )
Crooked Hill Road on the Menominee Indian Reservation in the Eastern )
District of Wisconsin )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1111 and 1153 (a) | Murder in Indian Country |
| 21 U.S.C. §§ 841(a)(1) | Distribution of a Controlled Substance |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

B. m. D'A   06/18/24 at 1530
*Applicant's signature*

Brian D'Arcy, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
*(specify reliable electronic means)*.

Date: 6/18/2024

*Judge's signature*

City and state: Green Bay, Wisconsin          Honorable James R. Sickel, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian D'Arcy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been employed as such since July 2017. Upon graduation from the FBI Academy in Quantico, Virginia, I was assigned to the Milwaukee Division, Green Bay Resident Agency. Since arriving in Green Bay, I have been assigned to work on various criminal violations, to include fraud, child pornography, armed robberies, drug trafficking, and crimes occurring on Native American reservations. I have experience in conducting criminal investigations involving suspects using electronic communications to orchestrate criminal activity. I have assisted in the execution of search warrants for the purpose of obtaining documents relating to various criminal activity. As a Special Agent of the FBI, I am authorized to investigate violations of the criminal laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2.     I make this affidavit in support of an application for a search warrant for information that is stored at premises controlled by Google, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Attachment B.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, I submit there is probable cause to search the information described in Attachment A for evidence of a violation of Title 18, United States Code, Sections 1111 and 1153(a) and Title 21, United States Code, Section 841(a)(1).

**JURISDICTION**

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**BACKGROUND RELATING TO GOOGLE<br>AND RELEVANT TECHNOLOGY**

6.     A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "landline" telephones. Cellular telephones rely on cellular towers, the location of which may provide information on the location of the subject telephone. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

7.     Google is an Internet company that, among other things, provides electronic communication services to subscribers. Google allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and

2

account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

8.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provides clues to their identity, location or illicit activities.

9.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

3

10.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. Further, information maintained by the email provider can show how, where, and when the account was accessed or used. Based on my training and experience, I have learned that Google also maintains records that may reveal other Google accounts accessed from the same electronic device, such as the same computer or mobile device, including accounts that are linked by Hypertext Transfer Protocol (HTTP) cookies, which are small pieces of data sent from a website and stored in a user's Internet browser.

11.     Google has developed an operating system for mobile devices, including cellular phones, known as Android. Nearly every cellular phone using the Android operating system has an associated Google account and users are prompted to add a Google account when they first turn on a new Android device.

12.     Based on my training and experience, I have learned that Google collects and retains location data from Android-enabled mobile devices when a Google account user has enabled Google location services. The company uses this information for location-based advertising and location-based search results. This information is derived from GPS data, cell site/cell tower information, and Wi-Fi access points.

13.     Location data can assist investigators in understanding the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic

4

location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).

## **PROBABLE CAUSE**

14.     On October 30, 2023, Menominee Tribal Police Department (METPD) Detective Joshua Lawe was contacted by Menominee Tribal Warden Maniyan Pyawasay. Pyawasay advised Detective Lawe that her department received a call from an individual by the name of Allen Grignon who believed he may have located a human skull while hunting on October 29, 2023. On October 30, 2023, Detective Lawe, METPD Evidence Specialist/Officer Paige Lehman, and Menominee Tribal Wardens accompanied Grignon to an area off County Highway M and Crooked Hill Road on the Menominee Indian Reservation (MIR). While driving to the location, Grignon informed Detective Lawe that he and his family were hunting the day before and chased a deer into the area. Grignon was walking in the woods looking for blood from the deer and came across what he thought to be a human skull. Upon arriving in the area, Grignon informed officers that they had to drive down a trail. From the trail, Detective Lawe and other officers walked into a wooded area approximately 60 to 80 yards from the trail, where Detective Lawe observed a fully intact human skull with teeth containing what appeared to be dental fillings. Detective Lawe documented the location of the skull with the following GPS coordinates: 45.022133, -88.727002. Images depicting the location of the skull are included below.

5





15.     Following the discovery of the skull, a search of the immediate and surrounding area was conducted by the FBI Milwaukee Evidence Response Team, Menominee Tribal Enterprises employees (logging employees), METPD officers, Menominee Tribal wardens, Cadaver K9 handlers, Anthropologist Jordan Karsten, Ph.D., and University of Wisconsin: Oshkosh anthropology students. A total of four searches occurred on October 30, October 31, November 7, and November 9, 2023. These searches included a detailed search and excavation of the immediate area surrounding the skull, as well as searches and excavations of the locations where other skeletal remains were discovered. A concentrated search of the area surrounding the skull was conducted by instructing personnel to search within an arm's length of one another while raking through leaves in order to disturb the ground to help facilitate the discovery of skeletal

7

remains. General line searches were also conducted in areas further out from the location of the skull. During the searches, a number of skeletal remains were located. According to Dr. Karsten, the remains appeared to have been scattered by carnivore scavenging. No clothing, apparel, personal belongings, or other evidentiary items were located. An image of the assembled remains is included below.



16.     Following the recovery of the skeletal remains, the bones were examined by Dr. Karsten at the University of Wisconsin-Oshkosh Forensic Anthropology Laboratory. In his report, Dr. Karsten noted that many of the recovered skeletal elements displayed evidence of carnivore scavenging. Dr. Karsten searched the remains for any signs of trauma and noted that, "No perimortem trauma is observed." Dr. Karsten estimated that the postmortem interval, or the amount

8

of time that has elapsed since an individual's death, was at least 119 days (July 3, 2023). However, he noted in his report that he believed "it is more likely that the postmortem interval is at least 515 days (June 2, 2022).

17.	In an attempt to determine the identity of the remains, teeth from the discovered remains were sent to the Wisconsin State Crime Laboratory for DNA extraction. On January 26, 2024, the Menominee Tribal Police received a DNA Databank Notification: Investigative Lead Report from the Wisconsin State Crime Laboratory. The report stated that the "evidentiary DNA profile was linked in the Combined DNA Index System (CODIS) on 01/11/2024 to: Dean Ford, Date of Birth (DOB) 04/25/1992. CODIS is a database maintained by the FBI for searching DNA profiles.

18.	Following the notification from the Wisconsin State Crime Laboratory, investigators obtained dental records for Dean Ford from the Wisconsin Department of Corrections. Dr. Karsten and Forensic Dentist Gabriel Legros, D.D.S., then compared these dental records to the teeth located with the human remains. Dr. Legros' report concluded the following: "After comparing the antemortem and postmortem records, it is my opinion to within a reasonable degree of scientific and clinical reliability that Menominee Case #INV202300881 can be positively identified as Dean A. Ford (DOB 04/25/1992)."

19.	Following the identification of Ford, investigators requested any law enforcement reports involving Dean Ford from surrounding counties, as well as state probation files for Ford. According to a Shawano Police Department report, officers responded to a domestic call involving Dean Ford and his girlfriend, Taylor Cordts, at 503 East Green Bay Street in Shawano, on July 7, 2018. The report indicated that Ford had left the residence prior to the arrival of officers. On July 9, 2018, an officer spoke with Ford over the phone about the domestic incident and requested that Ford come to the police department. Ford refused and said that he would get in contact with his

9

probation agent first. According to Wisconsin State Probation files, Ford last contacted his probation agent on July 10, 2018 via text message, stating that he did not hurt his girlfriend and requesting that the warrant be dropped. Based on a review of law enforcement and state probation records that were obtained, it appears that this was the last time Ford had contact with any law enforcement authority. As far as investigators are aware, only one missing person report was made by a cousin of Dean Ford's, Sierra Ford, on April 1, 2019, to the Shawano Police Department. The complaint was taken, but Dean Ford was not entered as a missing person.

20.    On February 22, 2024, investigators interviewed the sister of Dean Ford, Hailey Alegria. Hailey said that the last time she saw and spoke with Ford in person was on July 25, 2018. Hailey also stated that she still had Facebook Messenger messages with Ford from July 23, 2018 on her phone. Hailey provided Ford's Facebook profile, which was listed as "Dean Ohh Zayynx (Randy Moss)." The URL for the profile was listed as https://www.facebook.com/WannaGoHome84."

21.    On April 12, 2024, Facebook provided records for the Facebook profile, "Dean Ohh Zayynx," pursuant to a federal search warrant. Based on a limited review of the Facebook records, Ford's last outgoing communication was at approximately 10:30 PM on July 23, 2018. During a review of Facebook Messenger messages sent between Ford and others on July 22, 2018 and July 23, 2018, investigators observed a conversation between Ford and the Facebook profile, "Nate Robinson." On July 22, 2018, Ford told Robinson that he wanted to find a "ball." In my training and experience, I am aware that a "ball" is a term often used to describe a quantity of illegal drugs. Robinson then told Ford, "The only person ik (*I know*) that can find that is liza." Ford responded, "She couldn't even find it." The conversation then appears to suggest that Ford was with Liza at some point and they were unable to find illegal drugs. At approximately 6:34 PM on July 22, 2018, Robinson told Ford to add Liza on Facebook and provided Ford with the profile name, "Liza

10

Playtigress." "Liza Playtigress" was later identified by investigators as Liza Naumann. The following day, at approximately 8:38 PM (July 23, 2018), Robinson sent the following message to Ford: "Liza said she ain't round wifi but she said lets go nowwwww." Based on the investigation to date, I believe that this message suggests that Ford and Liza Naumann were attempting to meet up and Robinson was telling Ford that Naumann was waiting for him. Two days later, at approximately 9:10 PM on July 25, 2018, Robinson messaged Ford, "Are you alright? I hurd u jumped out of ol girls car."

22.     On May 1, 2024, investigators interviewed Nate Robinson at the Shawano County Jail. Robinson said that the last time he saw Dean was in 2018. Robinson said that he and Dean knew Liza Naumann but did not hang out with her. Robinson described Naumann as a person they could get methamphetamine from. Robinson said that Naumann told him about Ford trying to rob her. Naumann was somewhere in Keshena and Ford attempted to take something and then jumped out of the car and ran into the woods. This was why Robinson asked Ford about jumping out of Naumann's car in his Facebook message ("Are you alright? I hurd u jumped out of ol girls car"). Robinson could not recall if he saw Ford after this incident.

23.     During the review of Facebook Messenger messages sent between Ford and others on July 22, 2018 and July 23, 2018, investigators located a conversation between Ford and the Facebook profile "Liza PlayTigress," or Liza Naumann. The messages between Naumann and Ford began on July 22, 2018 at approximately 6:51 PM and ended on July 23, 2018. The initial messages between Naumann and Ford suggest that Ford was attempting to purchase some type of illegal drug from Naumann for another individual. Later in the conversation, Ford asked Naumann, "U got any loot, if ya do wanna throw down." In my training and experience, I believe Ford was asking Naumann if she had any money to purchase drugs with Ford.

11

24.     At approximately 7:31 PM on July 23, 2018, Ford messaged Naumann, "Meet me at the end of rainbow trail." Around 8:27 PM on July 23, 2018, Naumann messaged Ford, "Here where u at." As noted above, this was just prior to the time that Robinson messaged Ford stating, "Liza said she ain't round wifi but she said lets go nowwwww." Around five hours later, at approximately 1:35 AM on July 24, 2018, Naumann sent the following message to Ford: "I'm coming back to u alone If u get this please let me know ur ok plz u got me." At approximately 1:36 AM, Naumann then messaged, "I'm freaking out I pray ur ok." Later in the morning on July 24, 2018, at approximately 6:11 AM, Naumann sent the following message to Ford: "Well I'm grateful that ur ok thanks for letting me know…"

25.     Based on the Facebook messages and the investigation to date, I believe these messages suggest that Naumann met Ford on July 23, 2018, possibly at the end of Rainbow Trail on the Menominee Indian Reservation. Following this, something appears to have happened to Ford to cause Naumann concern ("I'm freaking out I pray ur ok"). As noted previously, Ford's last outgoing Facebook message was sent at approximately 10:30 PM on July 23, 2018.

26.     On May 21, 2024, investigators interviewed Liza Naumann. Naumann confirmed that the Facebook account "Liza Playtigress" belonged to her and that she was with Ford on July 23, 2018. Naumann did not know Ford prior to this and could not recall how she came about meeting Ford. Naumann believed that Ford may have been looking for pills because the girl that Naumann was living with at the time sold pills. On the evening of July 23, 2018, Naumann borrowed her friend's car and drove up to the Menominee Indian Reservation to meet Ford. Naumann recalled meeting Ford in a confusing area with many trails and courts. Naumann gave Ford a couple of pills and could not remember clearly, but believed she was supposed to give Ford a ride from one place to another. While driving with Ford, Naumann felt uneasy about him and decided to drive to Neopit to pick up her friend Bridget Smith AKA "Bubby." After picking up

12

Smith, Naumann, Ford, and Smith went to Captain's Cove, which is located just West of Middle Village. Naumann said that Ford began to act weird when they were at Captain's Cove. Naumann described Ford as acting very paranoid and worrying that his girlfriend was somewhere and that he was going to get beat up. Naumann stated that Ford was high on methamphetamine. She knew this because Ford had a "bubble," or what Naumann described as a pipe used to smoke methamphetamine.

27.      After spending an hour or two at Captain's Cove, they then drove back up to Neopit and cut across the reservation. Naumann described taking a back way that was all woods and logging roads. Naumann was driving, Ford was sitting in the front passenger's seat, and Smith was behind Naumann. While Naumann was driving, she observed Ford reach down and grab his bag out of the corner of her eye. He then opened the door and jumped out of the vehicle. Naumann estimated her speed was around 55 MPH at the time that Ford jumped out of the car. After Ford jumped out of the car, Naumann stopped the vehicle and pulled onto a logging trail. She then grabbed work boots and a flashlight from her car and went looking for Ford for a few hours while Smith stayed in the car. Naumann was unable to find him, so she returned to the car and drove Smith back to Neopit.

28.      When asked about the messages sent to Ford around 1:30 AM on July 24, 2018, Naumann said that she sent the message about coming back alone to see if she could get Ford to respond to her. Naumann was not sure if Smith had triggered Ford's paranoia about his girlfriend or if Ford was possibly seeing things and thought Smith was his girlfriend. Naumann figured that if she phrased the text message that way, she might at least be able to get Ford to answer her. Shortly after the incident, Naumann learned that Ford's girlfriend had come and picked him up. Naumann estimated that she learned this possibly a day or so after the incident. Naumann believed

13

she learned this from an individual by the name of Nate Robinson. Naumann cited this as one of the reasons she did not report Ford jumping out of her car.

29. On May 28, 2024, investigators met with Naumann to drive the route that she remembered taking with Ford on the evening of July 23, 2018. Naumann told investigators that she took County Road VV East to meet Ford. While driving County Road VV East, Naumann eventually directed investigators to turn North onto Rainbow Road. Naumann then directed investigators to the North dead-end of Running Bear Road and said that she met Ford at this location. This road runs adjacent to Rainbow Trail, where Ford told Naumann to meet him ("Meet me at the end of rainbow trail). In my experience working on the reservation, the roads to the North of County VV East leading to the various lake lots are difficult to navigate, as Naumann mentioned in her interview with investigators.

30. Naumann then directed investigators to head back to County Highway VV East and to then head North on State Highway 47. Once in Neopit, Naumann told investigators to turn left on 1st Avenue in Neopit and indicated that N3518 was Smith's sister's house, where she picked up Smith on the evening of July 23, 2018. From here, Naumann said that she, Smith, and Ford drove to Captain's Cove, which is just to the West of Middle Village. After leaving Captain's Cove, they drove back up State Highway 47 towards Neopit. Naumann believed that she took County Highway M as a back way to get to Keshena and County Road VV, where Ford was staying.

31. While driving County Road M, Naumann was instructed to tell investigators to stop at any point where she may have recalled Ford jumping out of the vehicle. Naumann instructed investigators to stop at a logging road about three miles East of Neopit and three miles West of the location where Ford's remains were found off County Road M. When asked about her confidence level regarding the accuracy of this location, Naumann said that she was not confident. Naumann

14

was also unsure of the direction they were traveling on County Road M, however, she did believe that they were traveling on County Road M when Ford jumped out of the vehicle. A Google Earth image of County Road M with the stopping point is included below.



32.    During the review of the route, Naumann provided some additional information regarding the evening of July 23, 2018. Naumann said that Ford started acting weird when they were up in Neopit. When she was inside at Smith's sister's house in Neopit, Ford was out in the car using methamphetamine. Naumann said that Ford did not make any comments about wanting to die or hurt himself, but was acting worried and as if something was going to happen to him. Naumann described it as bits and pieces of things that Ford would say and not a full-blown conversation between her and Ford. When Ford jumped out of the car and she went looking for him, Naumann said that Smith was freaking out because she may have had warrants at the time. When asked about the message that she sent to Ford on July 24, 2018, at approximately 6:11 AM, ("Well I'm grateful that ur ok thanks for letting me know…'), Naumann said that she likely sent

15

this message because she may have heard from Nate Robinson or someone else that Ford was okay after jumping out of the car.

33.     On June 3, 2024, investigators interviewed Nate Robinson again at the Shawano County Jail. When asked if he recalled telling Naumann that Ford had been picked up by his girlfriend after jumping out of Naumann's car, Robinson said that he did not recall making such a statement. Robinson said that when he sent the messages to Ford over Facebook Messenger asking if Ford was okay, he remembered the "bubble" showing up on the messages, suggesting that the messages were opened. However, he never received a response from Ford. Robinson believed that Naumann told him about the incident over Facebook. Naumann may have been calling him and it may have been the night of the incident. Robinson was not sure which Facebook account he was using at the time and said that he has had a handful of Facebook accounts that were hacked.

34.     Based on the review of Ford's Facebook Messenger messages and the interviews described above, I believe that Dean Ford met with Liza Naumann on the evening of July 23, 2018. The review of Ford's Facebook messages with Robinson and Naumann suggest that Naumann was likely connected to Ford through Robinson via Facebook. After meeting up with Ford, Naumann stated that she drove to Neopit to pick up her friend, Bridget Smith, who has since passed away. Smith, Ford, and Naumann then traveled to Captain's Cove, where they stayed for one to two hours. Following this, Naumann drove back up towards Neopit and described taking a back road which she believed to be County Road M to Keshena. While driving on County Road M, Naumann stated that Ford jumped out of the vehicle while she was traveling approximately 55 MPH. This narrative of events on the evening of July 23, 2018 appears to have been relayed to Nate Robinson, who stated that he recalled Naumann telling him that Ford tried to take something from her and jumped out of the car, leading him to ask Ford if he was okay on July 25, 2018 ("Are you alright? I hurd u jumped out of ol girls car"). As mentioned previously, Ford's last outgoing communication

16

on Facebook Messenger was at approximately 10:30 PM on July 23, 2018. Additionally, based on interviews, police reports, and state probation files, Ford appears to have last been seen in July 2018.

35.    I believe that obtaining an order such as that described in this search warrant application to receive the information described in Attachments A and B could potentially assist law enforcement in corroborating or disproving Liza Naumann's statement regarding her activity with Dean Ford on July 23, 2018. If Ford or Naumann's phone were geolocated within the area described in Attachment A, the requested geolocation information could help determine their specific whereabouts on the night of July 23, 2018. Additionally, the information obtained through the order could help to identify people who were in the vicinity of the area where Ford's remains were located. This information may assist investigators in identifying additional suspects or witnesses that are yet unknown.

36.    I am aware that Dean Ford was a Native American Indian. Federal jurisdiction for an investigation into his death attaches through that status and because the locations described above are within the exterior boundaries of the Menominee Indian Reservation in the Eastern District of Wisconsin.

37.    The geographical region bounded by the latitudinal and longitudinal coordinates listed in Attachment A, during the times and dates identified in Attachment A, reflects an area to the North of County Road M. The region was drawn in a manner to minimize inclusion of residences in the area, to avoid collecting information from people who were unassociated with the events described in this affidavit.

38.    The information sought from Google, as detailed in Attachment B, will identify which cellular devices were near the area where Dean Ford's remains were located, which may assist law enforcement in determining the identities of people who may know about his

17

disappearance and may provide more detailed geo-location information associated with Ford's phone.

## CONCLUSION

39.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Dated this ___18___ day of June, 2024.

_____  6/18/24 at 1532
BRIAN D'ARCY
Special Agent
Federal Bureau of Investigation


Sworn to before me this ___18___ day of June, 2024.

_____
HON. JAMES R. SICKEL
United States Magistrate Judge
Eastern District of Wisconsin

18

## ATTACHMENT A

### Property To Be Searched

This warrant applies to information associated with the Google accounts located within the geographical region near the intersection of County Highway M and Crooked Hill Road on the Menominee Indian Reservation in the Eastern District of Wisconsin and bounded by the following latitudinal and longitudinal coordinates between July 23, 2018 at 5:00 PM CST and July 30, 2018 at 5:00 PM CST, which was preserved on May 8, 2024 (0-8048000036682), and is stored at premises controlled by Google, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California 94043:



A: 45.023272, -88.733381

B. 45.023272, -88.723521

C: 45.019420, -88.733381

D: 45.019837, -88.727298

E: 45.019420, -88.723521

## ATTACHMENT B

### Items To Be Seized And Searched

**Information to be disclosed by Google**

Google shall provide responsive data (as described in Attachment A) pursuant to the following process:

1.      Google shall query location history data based on the Initial Search Parameters (as described in Attachment A).

2.      For each location point recorded within the Initial Search Parameters, Google shall produce anonymized information specifying the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available (the "Anonymized List").

3.      Law enforcement shall review the Anonymized List to remove devices that are not relevant to the investigation, for example, devices that were not in the location for a sufficient period of time. If additional location information for a given device ID is needed in order to determine whether that device is relevant to the investigation, law enforcement may request that Google provide additional location coordinates for the Time Period that fall outside of the Target Location. These contextual location coordinates may assist law enforcement in identifying devices that were located outside the Target Location, were not within the Target Location for a long enough period of time, were moving through the Target Location in a manner inconsistent with the facts of the underlying case, or otherwise are not relevant to the investigation.

4.      For those device IDs identified as relevant pursuant to the process described above, law enforcement may request that Google Provide identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Account associated with each identified device ID.